**Affirm and Opinion Filed September 6, 2023**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-21-00898-CV**

**IN THE INTEREST OF J.S., A CHILD**

**On Appeal from the County Court at Law No. 1**
**Kaufman County, Texas**
**Trial Court Cause No. 104418-CC**

## OPINION ON REMAND

Before Justices Partida-Kipness, Carlyle, and Breedlove[1]
Opinion by Justice Breedlove

Mother appeals the trial court's judgment terminating her parental rights to J.S. On original submission, this Court concluded that the trial court lost jurisdiction when it failed to make a finding of "extraordinary circumstances" required by section 263.401 of the Texas Family Code to extend the automatic dismissal deadline.[2] The Texas Supreme Court, however, reversed and concluded that section 263.401's requirements were mandatory rather than jurisdictional. *In re J.S.*, 670

---

[1] Justice Lana Myers was a member of the panel at the time the case was submitted. Justice Myers has now retired. Justice Maricela Breedlove has succeeded Justice Myers as a member of the panel and has reviewed the briefs and record.

[2] *In re J.S.*, 663 S.W.3d 784, 786 (Tex. App.—Dallas 2022), *rev'd*, 670 S.W.3d 591 (Tex. 2023).

S.W.3d 591, 606 (Tex. 2023). The court remanded the case for us to consider Mother's appellate issues. *Id.*

We now consider whether there was legally and factually sufficient evidence to support termination of Mother's parental rights to J.S. under family code subsections 161.001(b)(1)(D), (E), and (O), and to support the jury's findings that termination of Mother's parental rights was in J.S.'s best interest. We also consider whether the trial court abused its discretion by admitting certain exhibits into evidence. We conclude the evidence was sufficient to support the jury's findings and the trial court's judgment. We further conclude the trial court did not abuse its discretion in its evidentiary rulings. Accordingly, we affirm the trial court's judgment terminating Mother's parental rights to J.S.

## BACKGROUND

Two days after J.S. was born in December 2018, the Texas Department of Family and Protective Services (Department) received a report of abuse or neglect by Mother, who had tested positive for methamphetamines at a prenatal visit. *In re J.S.*, 670 S.W.3d at 594. Although both Mother and J.S. tested negative at J.S.'s birth, both of J.S.'s parents have a significant history of drug use and had previously lost custody of another child due to their drug use. *Id.* While Mother was in the hospital, the Department proposed placing J.S. with Mother's grandmother (Grandmother), and Mother agreed. The Department was aware of Mother's

methamphetamine use and her history of substance abuse, and it was concerned about her taking J.S. home.

In August 2019, J.S.'s parents were ordered to complete services through the Department, including substance abuse and psychological assessments, parenting classes, and random drug testing. *Id.* From August 2019 until February 2020, J.S.'s parents refused to participate in those court-ordered services despite many reminders and encouragements to do so from the Department's caseworker. *Id.*

In December 2019, Mother stated she wanted Grandmother to be J.S.'s legal guardian. The Department arranged for a home study on a home Grandmother planned to move into with J.S. The Department determined the home was not suitable and it would be dangerous for J.S. to reside there.[3]

At the end of one year of the parents' refusal to participate in services and the fact that Grandmother's home would no longer be suitable, the Department sought

---

[3] Cassie McCray, a Family Based Safety Service worker who testified at trial, later obtained access to the house and described it:

> I observed the outside of the home to have trash and miscellaneous items out. There was a space heater in one of the rooms. Also, there was electrical outlets that were hanging from the wall. There were also, like, a phone charger that was holding the door closed and there was also—it looked as if it was the aftermath of a fire that was in the kitchen area of the wall where the stove was. Also, there was old, standing water that was in one of the bathrooms. In one room, the window was missing. There were cigarette butts on the floor. Some of the light switches were taped to the wall. There was a plastic bag that was hanging over the ceiling in one bedroom. In the hallway, one of the bathrooms, like I said, it looked like it had not been utilized and it had old, standing water in the sink.

McCray testified that the contractor performing the home study notified her of "concerns of the environment for the child, it being unsafe."

a court order to remove J.S. and to place him in foster care. On February 4, 2020, the Department filed its initial petition to remove J.S. from Mother and Father's custody, terminate their parental rights, and appoint the Department as J.S.'s permanent sole managing conservator. *Id.* The trial court signed temporary orders the same day appointing the Department as temporary managing conservator, and the Department then took possession of J.S., who required urgent treatment for an ear infection. *Id.* The day after J.S. came into the Department's custody, his hair follicle[4] sample tested positive for methamphetamines and marijuana, with the methamphetamine test recording more than thirteen times the level needed to obtain a positive result. *Id.* J.S. also showed symptoms of withdrawal from methamphetamine, including sores on his face and itchy skin. Erika Anderson, the Department's caseworker who testified at trial, described J.S. as "wanting to come out of his skin." She also testified that J.S. would scream when put into water.

Anderson testified J.S. was developmentally delayed for a thirteen-month-old child when he came into the Department's conservatorship and that he exhibited behaviors that were not normal for a child his age. He had no words. He would not respond to his name. He would not make eye contact or reach for objects. He would not cry when he was hungry or when his diaper needed changing. He had a flat affect, no emotion. The foster parents got J.S. into the Green Apple program, which is for

---

[4] In this opinion, we refer to hair strand testing in the layman's terms used by the witnesses and in the relevant case law, not in scientific terms.

children suffering trauma and exposure to controlled-substance abuse. With speech, occupational, and physical therapy, J.S. improved. At the time of trial in June 2021, J.S. had been in a foster-to-adopt home for six months and had improved substantially since being removed from the custody of his parents. *Id.*

Although J.S. improved, the parents did not. Mother and Father received a family service plan, which the trial court incorporated into court orders. The plan required the parents to lead a drug-free lifestyle, not cut or dye their hair, not live with or care for any children under the age of 18 years old, submit to random drug tests, make a written acknowledgement of any recent illegal substance use, obtain individual counseling, complete parenting classes, obtain a psychological evaluation, obtain mental health services, initiate inpatient drug treatment, and attend AA/NA meetings.

Except for one drug test and two written acknowledgements of methamphetamine use, one on February 19, 2020 and another on March 1, 2020, Mother participated in none of the services. She told the caseworkers that transportation was a problem and that there was no public transportation where she lived. Anderson testified the Department provided Mother with information and vouchers for transportation, but Mother did not use them. Anderson also testified that she offered to personally transport Mother to drug testing, but Mother refused. Mother then did not go to drug testing. Mother also dyed her hair in violation of the court's order that prohibited her from doing so.

–5–

A visitation schedule was prepared, but the parents were sporadic in following it. They sometimes arrived for the visits after having used methamphetamine. After they kissed J.S., he would get red bumps on his face. Due to the COVID pandemic, the visits moved online, and the parents missed some visits. They appeared to be under the influence during at least one visit. Anderson testified that initially, J.S. was responding to the visits, but "because the visits were so sporadic, the bond was slowly unbonding."

The parents requested a jury trial, and the deadline for the case was extended to accommodate that request. The parents were notified of the date and time of the jury trial but did not appear. At the end of the trial, the jury found the Department had proved paragraphs (D), (E), (N), (O), and (P) of family code section 161.001(b)(1) as to both parents and that termination was in J.S.'s best interest. The trial court's judgment terminated the parent–child relationship between both parents and J.S. and appointed the Department as J.S.'s permanent managing conservator.

Only Mother appeals. In six issues, Mother complains the trial court erred by terminating her parental rights to J.S. In her first four issues, Mother challenges the legal and factual sufficiency of the evidence to support termination of her parental rights under family code subsections 161.001(b)(1)(D), 161.001(b)(1)(E), 161.001(b)(1)(O), and 161.001(b)(1)(P).[5] In her fifth issue, Mother contends the

---

[5] Mother has not challenged the sufficiency of the evidence to support the jury's finding on paragraph (N) of section 161.001(b)(1) in this appeal. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(N) (constructive abandonment of a child in the Department's conservatorship).

evidence was legally and factually insufficient to support a finding that termination of her parental rights was in J.S.'s best interest. In her sixth issue, Mother contends the trial court abused its discretion by admitting three exhibits into evidence.

## STANDARD OF REVIEW

The Texas Family Code provides that a court may order termination of a parent–child relationship if the court finds by clear and convincing evidence that the parent engaged in conduct prohibited by section 161.001(b)(1) and that termination is in the child's best interest. *See* TEX. FAM. CODE ANN. § 161.001(b)(1), (2). Because the fundamental liberty interest of parents in the care, custody, and control of their children is of constitutional dimensions, involuntary parental terminations must be strictly scrutinized. *In re K.M.L.*, 443 S.W.3d 101, 112 (Tex. 2014). In such cases, due process requires the petitioner to justify termination by clear and convincing evidence. TEX. FAM. CODE ANN. § 161.001(b); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012). "Clear and convincing evidence" is that "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *In re N.G.*, 577 S.W.3d 230, 235 (Tex. 2019) (per curiam); *In re N.T.*, 474 S.W.3d 465, 475 (Tex. App.—Dallas 2015, no pet.).

On appeal, we apply a standard of review that reflects the elevated burden at trial. *In re A.B.*, 437 S.W.3d 498, 502 (Tex. 2014); *In re A.T.*, 406 S.W.3d 365, 370 (Tex. App.—Dallas 2013, pet. denied). Under both legal and factual sufficiency

standards, we consider all the evidence, defer to the factfinder's credibility determinations, and determine whether the factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re N.T.*, 474 S.W.3d at 475. "The distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018).

In conducting a legal sufficiency review of an order terminating parental rights, the reviewing court cannot ignore undisputed evidence contrary to the finding but must otherwise assume the factfinder resolved disputed facts in favor of the finding. *Id.* We "consider all the evidence, not just that which favors the verdict," and we assume the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *In re N.T.*, 474 S.W.3d at 475 (internal quotation omitted). We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id.*

When reviewing the factual sufficiency of the evidence supporting a termination finding, we ask whether, in light of the entire record, the evidence is such that a factfinder could reasonably form a firm conviction about the truth of the allegations against the parent. *Id.*; *In re J.D.B.*, 435 S.W.3d 452, 463 (Tex. App.— Dallas 2014, no pet.). We must consider whether the disputed evidence is such that a reasonable factfinder could not have reconciled that disputed evidence in favor of its finding. *In re N.T.*, 474 S.W.3d at 475. If the disputed evidence is so significant

that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

In this case, the jury found Mother engaged in conduct prohibited by paragraphs (D), (E), (N), (O), and (P) of section 161.001(b)(1), and that termination was in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (N), (O), (P); *id.* § 161.001(b)(2). When, as in this case, a trial court terminates a parent's rights based on section 161.001(b)(1)(D) or (E) and the parent challenges that finding on appeal, due process requires the appellate court to review the finding and detail its analysis even if it affirms the termination order based on other grounds under section 161.001(b)(1). *In re C.W.*, 586 S.W.3d 405, 407 (Tex. 2019) (per curiam); *In re N.G.*, 577 S.W.3d at 235.

## ENDANGERMENT

In her first issue, Mother contends the evidence was legally and factually insufficient to support the jury's finding under section 161.001(b)(1)(D). That provision requires the jury to find by clear and convincing evidence that a parent: "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(b)(1)(D). "'[E]ndanger' means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, [but] it is not necessary that the conduct be directed at the child or that

the child actually suffers injury." *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987).

While paragraph (D) concerns endangerment due to the child's environment, parental conduct is relevant. *See In re J.D.B.*, 435 S.W.3d at 463. A parent's drug use, violence, or other abuse may make the child's environment endangering to the child. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). A parent acts "knowingly" when the parent is aware that the environment creates a potential danger to the child but the parent disregards that risk. *See In re P.N.T.*, 580 S.W.3d 331, 355 (Tex. App.—Houston [14th Dist.] 2019, pet. denied); *In re L.M.M.*, 522 S.W.3d 34, 44 (Tex. App.—Houston [1st Dist.] 2017, pet. denied).

Mother argues it was impossible for her to have endangered J.S. because she placed J.S. with Grandmother shortly after J.S. was born and Mother was allowed only supervised visits with J.S. for a year. However, Cassie McCray, a Family Based Safety Service worker who visited the family in that time period, testified that she believed the family was still living together.[6] When J.S. was placed into foster care, he tested positive for ingestion of methamphetamine within the preceding three months and was suffering symptoms of withdrawal. Mother knew she should not use methamphetamine because she was required to do drug testing and ordered to lead

---

[6] McCray testified that there were two homes on the property, both were used by the family, and at the time a home study was to be conducted on Grandmother's home, the family was all living in the same home.

a drug-free lifestyle. Yet she lived with J.S. and Grandmother and continued to use drugs even though that conduct created an environment where J.S. was exposed to methamphetamine, leading to his suffering withdrawal symptoms.

Considering all the evidence, we conclude the evidence is both legally and factually sufficient to produce in the minds of the jurors a firm belief or conviction as to the truth of the allegation that Mother knowingly placed or knowingly allowed J.S. to remain in conditions or surroundings which endangered his physical or emotional well-being. *See In re N.G.*, 577 S.W.3d at 235. We overrule Mother's first issue.

In her second issue, Mother contends the evidence was legally and factually insufficient to support the jury's finding to prove by clear and convincing evidence that Mother engaged in conduct or knowingly placed J.S. with persons who engaged in conduct which endangered his physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(E). This paragraph addresses parental misconduct.

Drug use during pregnancy, which Mother engaged in, may amount to conduct that endangers the physical and emotional well-being of the child. *In re C.J.B.*, No. 05-19-00165-CV, 2019 WL 3940987, at *7 (Tex. App.—Dallas Aug. 21, 2019, no pet.) (mem. op.). And continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct. *Id.*

The jury could find that Mother's drug use during pregnancy endangered the unborn J.S. The jury could also find that Mother continued to live with Grandmother and J.S. after J.S. was placed with Grandmother and that Mother endangered J.S. by using methamphetamine around him, leading to J.S.'s testing positive for methamphetamine and suffering withdrawal symptoms. Finally, the jury could find Mother's continued drug use after J.S.'s placement in foster care endangered him by jeopardizing the parent–child relationship.

The evidence also showed that Mother did not attend all the visits with J.S., even when they were virtual due to the COVID pandemic. From June to October 2020, the Department provided Mother at least thirteen opportunities for visits with J.S.; Mother attended nine of them. Anderson testified she sent Mother the links and times for logging in for the visits. The visits were all for the same time on the same day of the week. When Mother would fail to log in, Anderson would text Mother to remind her. Mother sometimes responded to these texts, but not until hours later. Sometimes, Mother requested an unscheduled visit. Anderson would arrange it and send Mother the link, but Mother "would never log on to the visit." Mother's last visit with J.S. was October 28, 2020, more than seven months before the trial on June 14 and 15, 2021. About three weeks before trial, Mother contacted Anderson asking to restart the visits.[7] Anderson testified that due to the sporadic nature of

---

[7] Anderson did not testify expressly whether any visits were arranged after October 28, 2020, and, if so, whether Mother attended them; however, she did testify that Mother's last visit with J.S. was October 28, 2020.

Mother's visits with J.S., the bond between them "was slowly unbonding." The jury could find Mother's sporadic visits followed by her failure to visit J.S. for months endangered him. *See In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at *6 (Tex. App.—Fort Worth Feb. 18, 2022, pet. denied) (mem. op.) (parent's inconsistent participation in visitation can endanger child's well-being).

Considering all the evidence, we conclude the evidence is both legally and factually sufficient to produce in the minds of the jurors a firm belief or conviction as to the truth of the allegation that Mother knowingly engaged in conduct or knowingly placed J.S. with persons who engaged in conduct that endangered his physical or emotional well-being. *See In re N.G.*, 577 S.W.3d at 235. We overrule Mother's second issue.

Having concluded that the evidence is sufficient to support the jury's findings under paragraphs (D) and (E), we need not address Mother's third and fourth issues contending the evidence was legally and factually insufficient to support the jury's findings under paragraphs (O) and (P). *See In re N.G.*, 577 S.W.3d at 232 (appellate court need uphold only one termination ground and best interest finding to affirm termination, but due process requires appellate court to provide details of its analysis under paragraphs (D) and (E) because of potential consequences for parental rights to a different child under paragraph (M)).

## BEST INTEREST OF THE CHILD

In her fifth issue, Mother contends the evidence is legally and factually insufficient to support the jury's finding that termination of the parent–child relationship was in J.S.'s best interest. The supreme court has set forth a list of non-exclusive factors to be considered in determining whether termination is in a child's best interest:

(1)    the child's desires;

(2)    the child's emotional and physical needs now and in the future;

(3)    any emotional and physical danger to the child now and in the future;

(4)    the parental abilities of the individuals seeking custody;

(5)    the programs available to assist the individuals seeking custody to promote the best interest of the child;

(6)    the plans for the child by the individuals or agency seeking custody;

(7)    the stability of the home or proposed placement;

(8)    the parent's acts or omissions which may indicate that the existing parent–child relationship is improper; and

(9)    any excuse for the parent's acts or omissions.

*In re E.N.C.*, 384 S.W.3d at 807 (quoting *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). This list is not exclusive, and the State need not prove all of the factors as a condition precedent to termination. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). We will review the evidence supporting each factor.

*1. The child's desires:* There was no direct evidence of J.S.'s desires. He was about two-and-a-half years old at the time of trial. However, Anderson testified that due to the sporadic nature of Mother's visits with J.S., they were "slowly unbonding."

*2. The child's emotional and physical needs now and in the future:* Anderson testified that J.S. appeared to have been neglected before he was placed in foster care. He was developmentally delayed for a thirteen-month-old, including "having no words," making no eye contact, having no socialization skills, still drinking out of a bottle, and having limited balance "so it was as if he just learned to walk." He had a flat affect, showed no emotion, and could not engage with adults or children. Anderson testified that J.S.'s "tantrums were more than what a 13-month-year-old [sic] should have been at that developmental point." J.S.'s physicians are also concerned he may have autism. J.S. receives speech therapy and cognitive behavioral therapy three times per week.

*3. Any emotional or physical danger to the child now or in the future:* The record supports a finding J.S. would be endangered if placed in Grandmother's or Mother's care. McCray testified she did not believe Grandmother was properly supervising Mother's visits with J.S. McCray also suspected that Mother was living with Grandmother and J.S. While J.S. was in Grandmother's care, he was neglected, and he ingested methamphetamine. He also requires regular therapy sessions, but the record supports a finding Mother would be unlikely to ensure he attended them.

–15–

Mother failed to attend her own drug tests and therapy, even when the Department arranged free transportation for her.

Anderson also testified about the house in which Mother lived at the time of trial. She was not allowed to enter the house, but she could smell a strong odor of urine, feces, and mold coming from the house. An extension cord ran to the house, which the jury could conclude indicated a lack of proper electricity provision. The grounds surrounding the house had broken-down cars that were open with exposed car parts. Anderson agreed that it was a home "that proposes [sic] a danger to a child."

A finding of further danger to J.S. is supported by evidence that both Mother and Father were addicted to methamphetamine and have done nothing during J.S.'s life to overcome their addiction. J.S. had already ingested methamphetamine at least once and suffered painful withdrawal symptoms. The evidence supported no reason to believe it would not happen again if J.S. were returned to Mother, Father, or Grandmother's care.

*4. The parental abilities of the individuals seeking custody:* J.S. is currently placed with a foster family who hopes to adopt him. The evidence shows the foster parents are providing J.S. the services he requires. In their care, J.S. is progressing. Anderson testified J.S. is doing better at engaging with other people and making eye contact. He has made a significant amount of progress based on how delayed he was and the health problems he had.

The evidence does not show Mother has any significant parenting ability. Mother used methamphetamine while pregnant with J.S. She used methamphetamine before visiting him. She was required to attend parenting classes but did not. Mother's attendance at visits with J.S. was sporadic at best and concluded with her not visiting J.S. in the months before trial. McCray testified that Mother said "she was going to go down to the courthouse to give legal custody to her grandmother." McCray said Mother's attitude was that she was not going to do drug testing or the other services and that the Department should give custody to Grandmother.

*5. The programs available to assist the individuals seeking custody to promote the best interest of the child:* Anderson testified that there is a program called the Green Apple program that provides the therapy sessions J.S. needs. Anderson also testified that these services were readily available near the foster parents and that they took J.S. to his therapy sessions.

*6. The plans for the child by the individuals or agency seeking custody:* Anderson testified that the Department's plan was for the foster family to adopt J.S. after the biological parents' parental rights were terminated. There is limited to no evidence of Mother's intentions because she did not attend the trial. The only evidence in the record is that she at some point wanted Grandmother to have custody of J.S. The Department presented evidence that while J.S. was placed with Grandmother, she did not provide proper care for him, she did not properly supervise

–17–

visits between J.S. and Mother and Father, and the home she was moving to was not appropriate for a young child.

*7. The stability of the home or proposed placement:* Anderson testified that J.S. "is in a foster-to-adopt home, so the goal is for [J.S.] to be adopted." The evidence concerning the foster home shows the placement is stable; J.S. is receiving the health care and therapy he requires and is overcoming his developmental delays while in his foster parents' care.

*8. The parent's acts or omissions that may indicate the existing parent–child relationship is improper:* Mother's conduct demonstrates the existing parent–child relationship is improper. Mother used methamphetamine while pregnant with J.S. Although Mother was informed repeatedly of the steps needed to regain custody of J.S. and to avoid termination of the parent–child relationship, she made almost no effort to comply with them. She participated in almost none of the services. Repeatedly, she agreed to get drug tested but then failed to show up for the testing. The drug test she did take showed she had used methamphetamine. Mother admitted to using methamphetamine. She scheduled psychological evaluations four times but did not appear for them. The caseworkers provided her with vouchers for free transportation to get to the services, yet she did not attend them. Mother was not working at the time, so the services did not conflict with her employment. McCray testified she believed Mother did not intend to complete the drug testing or the other services and that Mother wanted the Department to give custody to Grandmother.

Mother did not regularly attend the scheduled visits with J.S., even when the visits were online. Mother used methamphetamine before some of the visits, and at least one of the visits ended early because Mother appeared to be under the influence. Mother's last visit with J.S. was more than seven months before the trial. Neither Mother nor Grandmother with whom Mother wanted J.S. to be placed provided a home safe for J.S. after December 2019. Mother was informed of the date when her parental rights would be determined, yet she did not appear on either day of the two-day trial.

*9. Any excuse for the parent's acts or omissions:* The caseworkers testified that Mother made excuses for her failures, such as she did not feel well, she did not have a car at her disposal, or she did not want to ride in a car with other people.

On appeal, Mother argues "it is in her child's best interest that her parental rights not be terminated and that her child be placed with her or someone in her family." The caseworkers testified about the steps they took to place J.S. with a family member or friend of Mother, but they were unable to locate anyone who wanted to raise J.S. or whom the Department determined to be suitable.

The evidence shows Mother is a methamphetamine addict. The Department provided Mother with access to services that would help her overcome her addiction and remain the legal mother of her child. Mother, however, failed to participate in services that would have helped her. When J.S. was in Grandmother's care, he became so developmentally delayed that Anderson described him as neglected. The

–19–

Department required Mother to participate in services to improve her parenting, but Mother did not participate in them. When J.S. was removed from Grandmother's care, he was suffering painful withdrawal symptoms from exposure to methamphetamine. After being placed with a foster family, J.S. received therapy to overcome the developmental deficits, and his condition improved. Mother was scheduled to have weekly visits with J.S., but her attendance was sporadic. She did not have any visits with J.S. for seven months before the trial. Finally, Mother did not appear at the trial to defend her parental rights.

After considering all the evidence, we conclude the evidence is both legally and factually sufficient to produce in the minds of the jurors a firm belief or conviction that termination of the parent–child relationship between Mother and J.S. was in J.S.'s best interest. TEX. FAM. CODE ANN. § 161.001(b)(2). We overrule Mother's fifth issue.

**ADMISSION OF EVIDENCE**

In her sixth issue, Mother contends the trial court abused its discretion by admitting the written results of drug tests. In State's Exhibit 1, the drug test showed that a sample of J.S.'s hair collected on February 5, 2020, tested positive for methamphetamine and marijuana. In State's Exhibit 5, the drug tests showed that samples of Father's urine collected on October 2, 2020, tested positive for amphetamine, methamphetamine, and marijuana. In State's Exhibit 6, the drug tests showed that a sample of Mother's urine collected on October 2, 2020, tested positive

–20–

for amphetamine, methamphetamine, and the benzodiazepines nordiazepam, oxazepam, and temazepam, and that a sample of her hair collected the same day tested positive for amphetamine and methamphetamine.

We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex. 2005) (per curiam). A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner without reference to any guiding rules or principles. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex. 1985); *In re A.C.M.*, No. 05-15-01069-CV, 2016 WL 692827, at *2 (Tex. App.—Dallas Feb. 22, 2016, no pet.) (mem. op.).

The written results for each of the tests were attached to an affidavit stating:

> My name is [affiant]. I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated, which are true.
>
> I am the custodian of records of Texas Alcohol & Drug Testing Service, Inc., located at [address]. Attached hereto are [3, 7, or 8, depending on the exhibit] pages of records from Texas Alcohol & Drug Testing Service, Inc. regarding hair/urine/oral fluid testing utilizing strict chain of custody procedures, which was performed utilizing GC/MS (gas chromatography/mass spectrometry) instruments by a Certified Scientist and reviewed by a licensed Medical Review Officer. These said [3, 7, or 8] pages of records are kept by Texas Alcohol & Drug Testing Service, Inc., in the regular course of business, and it was the regular course of business of Texas Alcohol & Drug Testing Service, Inc. for an employee or representative of Texas Alcohol & Drug Testing Service, Inc., with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the record or to transmit information thereof to be included in such record, and the record was made at or near the time or reasonably soon thereafter. The records attached hereto are the original or exact duplicates of the original.

The test results were signed by the medical review officer, an M.D., verifying that the test was positive. The test results in each of the three exhibits identify the collection site, date, type of panel test used, and name of the lab that performed the test. Included in each of the exhibits was the laboratory report indicating the quantitative results, identifying the lab as "DHHS Certified." Also attached to each exhibit was the Forensic Drug Testing Custody and Control Form for the samples.

Mother's counsel objected to State's Exhibit 1, the drug-test results for J.S.:

> Your Honor, I'm going to object to hearsay. While there's a business record affidavit, there's not a litigation packet that's attached to this, and the person who has signed for the business record affidavit has not been verified as an expert to be able to talk to the scientific formula behind these drug tests. I would say while the business record affidavit, on its face is fine, this witness is not trustworthy because this witness doesn't have the scientific knowledge to prepare that to the Court.

Mother's counsel also objected to State's Exhibits 5 and 6, the drug test results for her and for Father, stating:

> Your Honor, I'm going to object as to hearsay and reflect my objection to the earlier drug test. I believe that this witness has not been proven up as an expert and the business record affidavit is not trustworthy in that the person who is in control of the business records is not an expert as to scientific methods to drug testing.

The trial court overruled Mother's objections, stating the objections went to the weight of the evidence and not the admissibility of the exhibits.

Mother's objection is that the sponsoring witnesses for the exhibits, neither of whom was a scientist,[8] were not qualified to testify about the reliability of the drug tests. However, there is no requirement in termination cases that the sponsoring witness be capable of testifying about the reliability of the test when the documents establish the reliability. *See, e.g., In re S.W.W.*, No. 14-22-00503-CV, 2022 WL 17982904, at *7 (Tex. App.—Houston [14th Dist.] Dec. 29, 2022, pet. denied) (mem. op.) (noting court has "consistently rejected" argument that expert testimony was necessary for admission of drug test results).

Other appellate courts have found practically identical documents sufficient to establish the reliability and admissibility of the tests. *See id.*; *see also F.C. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-19-00625-CV, 2020 WL 101998, at *6 (Tex. App.—Austin Jan. 9, 2020, no pet.) (mem. op.). In *F.C.*, the court concluded that because the hair follicle test was accompanied by an affidavit that complied with evidence rule 902(10)(B), "the only question regarding its admissibility was whether the drug test showed sufficient indicia of trustworthiness to bring it within the business-records exception to the hearsay rule." *F.C.*, 2020 WL 101998, at *6 (citing TEX. R. EVID. 803(6)); *see also* TEX. R. EVID. 902(10)(B) (requirements for self-authentication of business records accompanied by affidavit). The business records

---

[8] McCray, the Family Based Safety Service worker for the Department, was the sponsoring witness for State's Exhibit 1. She described her position as working with families of children who are not in the care and custody of the Department. Anderson, the caseworker for the Department working with Mother and Father in this case, was the sponsoring witness for State's Exhibits 5 and 6.

affidavit in *F.C.* contained identical language to the affidavits in this case, averring that the drug testing "utilize[ed] strict chain of custody procedures" and "was performed utilizing GC/MS (gas chromatography/mass spectrometry) instruments by a certified scientist and reviewed by a licensed medical review officer." *F.C.*, 2020 WL 101998, at \*6. As in *F.C.*, Exhibits 5 and 6 also included testimony to establish the requirements for a self-authenticating business record under evidence rule 902(10)(B). *See id.* Further, the court in *F.C.* relied on other indicia of trustworthiness that are also included in Exhibits 5 and 6 in this case:

> The drug test itself was signed by the medical review officer, an MD, verifying that the test was positive. The test result identifies the collection site, date, type of panel test used, and name of the lab that performed the test. Attached also to the business-records affidavit within PX-7 was (a) the laboratory report indicating the quantitative results, identifying the lab as "DHHS Certified," and (b) the "Hair and/or Urine Custody and Control Form" that accompanied the sample Father provided as it was transported from the testing facility to the laboratory.

*Id.* The court concluded that the trial court did not abuse its discretion in determining that the drug test and accompanying affidavit showed sufficient indicia of trustworthiness to be properly admitted as a business record. *Id.*; *see also In re O.G.H.D.*, No. 09-21-00172-CV, 2021 WL 4466002, at \*7 (Tex. App.—Beaumont Sept. 30, 2021, no pet.) (mem. op.) (affidavit from Texas Alcohol and Drug Testing Service and the attached documents established reliability of drug test results); *In re E.B.*, No. 11-19-00001-CV, 2019 WL 3955974, at \*3 (Tex. App.—Eastland Aug. 22, 2019, no pet.) (mem. op.) (same). We reach the same conclusion here.

–24–

Even if the trial court erred by admitting the exhibits, we cannot reverse unless the record establishes that the evidence probably caused the rendition of an improper verdict. TEX. R. APP. P. 44.1(a); *see In re A.H.J.*, No. 05-15-00501-CV, 2015 WL 5866256, at *5 (Tex. App.—Dallas Oct. 8, 2015, pet. denied) (mem. op.). We review the entire record to determine if the error was harmful. *In re B.K.G.D.*, No. 01-20-00057-CV, 2020 WL 3821086, at *15 (Tex. App.—Houston [1st Dist.] July 2, 2020, pet. denied) (mem. op.). A successful challenge to a trial court's evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence admitted or excluded. *Id.* "The general rule is error in the admission of testimony is deemed harmless and is waived if the objecting party subsequently permits the same or similar evidence to be introduced without objection." *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 907 (Tex. 2004); *see also In re D.R.*, 631 S.W.3d 826, 838 (Tex. App.—Texarkana 2021, no pet.) (admission of drug test results was harmless where mother failed to object to testimony containing substantially the same information).

Concerning State's Exhibit 1, the test results of J.S.'s hair sample collected on February 5, 2020, although Mother objected to the admission of the written test results, witnesses testified about the test results without Mother objecting. McCray testified without objection that J.S. "was tested by hair follicle and was found to have—his body had somehow ingested quite a bit of methamphetamine." Anderson testified without objection that when J.S. came into the Department's care, the level

–25–

of methamphetamine in his hair was "quite high." We conclude the admission of State's Exhibit 1, if erroneous, was harmless because Mother did not object to other evidence proving the same or similar facts.

Concerning State's Exhibits 5 and 6, the test results of Mother's and Father's hair and urine samples collected October 2, 2020, Mother does not explain why the admission of these test results was likely to result in the rendition of an improper judgment. The evidence that Mother and Father used methamphetamine during the pendency of the case was relevant to several of the statutory factors for termination. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), and (P). Other evidence that Mother and Father used methamphetamine during the pendency of the case was admitted without objection. Mother signed forms acknowledging she used methamphetamine on February 19, 2020, and March 1, 2020. Father signed forms acknowledging he used methamphetamine on February 14, 2020, and March 4, 2020, and that he tested positive for methamphetamine from an oral swab collected on March 6, 2020. These forms were admitted without objection. Also, Anderson testified without objection that both parents admitted at a previous hearing that they were addicted to methamphetamine, that they moved to get away from drugs, but Father knew where to get drugs in the area they moved to, and that they used drugs the day before the hearing. We conclude the admission of State's Exhibits 5 and 6, even if erroneous, was harmless because similar evidence was admitted without objection. *See In re D.R.*, 631 S.W.3d at 838.

We overrule Mother's sixth issue.

## CONCLUSION

We affirm the trial court's judgment.

210898f.p05

/Maricela Breedlove/

MARICELA BREEDLOVE
JUSTICE



## Court of Appeals
## Fifth District of Texas at Dallas

### JUDGMENT

IN THE INTEREST OF J.S., A
CHILD

No. 05-21-00898-CV     V.

On Appeal from the County Court At
Law No. 1, Kaufman County, Texas
Trial Court Cause No. 104418-CC.
Opinion delivered by Justice
Breedlove. Justices Partida-Kipness
and Carlyle participating.

In accordance with this Court's opinion of this date, the judgment of the trial
court is **AFFIRMED**.

Judgment entered this 6th day of September, 2023.